J-A32004-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHALSEE L. HUGHES, | |
| Appellant | No. 149 WDA 2015 |

Appeal from the Judgment of Sentence July 1, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000429-2013

BEFORE:  SHOGAN, OTT, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JANUARY 25, 2016**

Appellant, Chalsee L. Hughes, appeals from the judgment of sentence entered following her convictions of robbery and conspiracy to commit robbery.  We affirm.

We summarize the history of this case as follows.[1]  Shortly after midnight on December 3, 2012, Monessen police discovered the dead body of Christopher Fincik ("Victim") lying inside of the front doorway of his home.  The rear door of the home had bullet holes and shattered glass.  The kitchen was in disarray with blood on the walls and floor.  There was a trail of blood from the kitchen to the front door where the body was found.  Police

_____

[1] For a more detailed recitation of the facts of this case, we direct the reader to pages 2 through 12 of the opinion of the trial court dated December 23, 2014.

observed drugs, drug paraphernalia, and currency in the amount of $3,241.00 on the kitchen table. Outside the rear door were two Winchester 7.62 x 39 discharged cartridge cases and one Tulammo 7.62 x 39 discharged cartridge case which can be fired from an AK-47 assault rifle.

The following day, police executed an arrest warrant for Earl Pinkney on unrelated crimes and a search warrant for his residence on Chestnut Street in Monessen. Appellant (who was Pinkney's girlfriend) was found at Pinkney's residence and was taken to the Monessen Police Department where she was interviewed after waiving her *Miranda* rights. Appellant told police that she had spent most of the day of December 2, 2012, with Pinkney, and that they were in bed together all night.

On December 5, 2012, Appellant contacted Monessen Police seeking her cell phone that had been seized in the search of Pinkney's residence on December 4, 2012. Appellant went to the police station where she again waived her *Miranda* rights and was interviewed. Police knew that Appellant was seen on video at a Wal-Mart, along with Josh Stepoli and Antoine Hairston, purchasing a box of Winchester 7.62 x 39 ammunition at 9:12 p.m. on December 2, 2012. Appellant claimed that she purchased the ammunition because Stepoli did not have a proper form of identification. Appellant also claimed that Pinkney admitted to her that Pinkney, Stepoli, and Hairston robbed Victim and shot him. (As it turns out, Victim was

Appellant's godfather.) Subsequently, Appellant made statements to a fellow inmate implicating herself in the robbery of Victim.

On December 27, 2012, Appellant was charged with various crimes in relation to the death of Victim, including murder, robbery, and conspiracy. Appellant's jury trial began on March 25, 2014. At Appellant's trial, the defense was precluded from mentioning that neither Stepoli nor Hairston was criminally charged. The Commonwealth was permitted to admit testimony from a police officer regarding Appellant's statements to police about Pinkney's confession to Appellant.

At the conclusion of her trial, Appellant was convicted of robbery as an accomplice and criminal conspiracy to commit robbery. The jury found Appellant not guilty of the remaining charges. On July 1, 2014, the trial court sentenced Appellant to concurrent terms of incarceration of four and one-half to nine years. Appellant filed a timely post-sentence motion, which the trial court denied. This appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review, which we have renumbered for ease of disposition:

> I. THE TRIAL COURT ERRED BY PRECLUDING THE DEFENSE FROM PRESENTING EVIDENCE AND ARGUING THAT THE COMMONWEALTH'S DETERMINATION NOT TO FILE CHARGES AGAINST [APPELLANT'S] ALLEGED CO-CONSPIRATORS COULD BE CONSIDERED BY THE JURY IN THEIR DELIBERATIONS OF [APPELLANT'S] GUILT.

II. THE TRIAL COURT ERRED IN ALLOWING DOUBLE-HEARSAY TESTIMONY OF A NON-TESTIFYING WITNESS, EARL PINKNEY, RELATING TO MR. PINKNEY'S INVOLVEMENT IN THE SHOOTING AND ROBBERY.

III. WHETHER THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT [APPELLANT] WAS GUILTY OF ROBBERY AS AN ACCOMPLICE AND CONSPIRACY TO COMMIT ROBBERY.

IV. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

Appellant's Brief at 4.

Appellant first argues that the trial court erred in precluding her attempt to admit into evidence the fact that the Commonwealth failed to file charges against her co-conspirators. Appellant's Brief at 12-15. Appellant contends that the Commonwealth's determination to not charge Stepoli and Hairston in the instant matter was relevant to the jury's determination regarding whether Appellant was an accomplice.

Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision on such a question absent a clear abuse of discretion. *Commonwealth v. Maloney*, 876 A.2d 1002, 1006 (Pa. Super. 2005). An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa. Super. 2001).

Pa.R.E. 402 provides that generally, "[a]ll relevant evidence is admissible" and "[e]vidence that is not relevant is not admissible." Furthermore, Pa.R.E. 401 provides the following test for relevancy:

Evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

> (b) the fact is of consequence in determining the action.

Pa.R.E. 401.

Thus, the basic requisite for the admissibility of any evidence in a case is that it be competent and relevant. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa. Super. 2003). Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. *Commonwealth v. Barnes*, 871 A.2d 812, 818 (Pa. Super. 2005). Though relevance has not been precisely or universally defined, the courts of this Commonwealth have repeatedly stated that evidence is admissible if, and only if, the evidence logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact. *Freidl*, 834 A.2d at 641.

In addition, we are mindful that our state legislature has pronounced the following regarding liability for conduct of another and prosecution as an accomplice:

> An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted.

18 Pa.C.S. § 306(g).

In **Commonwealth v. McEnany**, 732 A.2d 1263 (Pa. Super. 1999), this Court applied the above statute along with relevant case law and held that "the fact that [the a]ppellant's alleged co-felon was not charged was irrelevant if offered to prove [the a]ppellant's innocence. Accordingly, the trial court properly precluded [the a]ppellant's attempt to show that his alleged co-felon was not charged with any crime surrounding the murder of [the victim]." **Id**. at 1274. In addition, we have explained, "The express language of [18 Pa.C.S. § 903 regarding conspiracy] does not require that an alleged co-conspirator be charged or convicted of the conspiracy." **Commonwealth v. Fremd**, 860 A.2d 515, 521 (Pa. Super. 2004).

Our review of the record reflects that, at the outset of Appellant's opening argument, defense counsel mentioned the fact that neither Stepoli nor Hairston had been charged in the crime and the Commonwealth immediately objected based upon relevancy. N.T., 3/25/14-4/2/14, at 14. The trial court sustained the Commonwealth's objection and instructed the jury that "[t]he status of any other person who may or may not be an accomplice . . . is not relevant as to the evidentiary proofs that must be brought in this case." **Id**. at 15-16. This determination by the trial court

was in accord with the above-mentioned legal authority. Therefore, we cannot conclude that the trial court abused its discretion in refusing to permit Appellant to discuss or present evidence regarding the fact that Appellant's co-conspirators had not been criminally charged. Thus, this claim lacks merit.

Appellant next argues that the trial court erred in admitting, what Appellant claims to be, double hearsay testimony. Appellant's Brief at 16-21. Specifically, Appellant alleges that her statement to Detective Robert Weaver concerning what her boyfriend, Earl Pinkney, told her regarding the crime the day after the incident was not made in furtherance of a conspiracy with Stepoli and Hairston, and therefore should not have been admitted at trial.

Hearsay has been defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). ***Commonwealth v. Smith***, 586 A.2d 957, 963 (Pa. Super. 1991). Hearsay testimony is not admissible in this Commonwealth, except as provided in the Pennsylvania Rules of Evidence, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802. "The rationale for the hearsay rule is that hearsay is too untrustworthy to be considered by the trier of fact." ***Commonwealth v. Bean***, 677 A.2d 842, 844 (Pa. Super. 1996).

In addressing Appellant's claim the trial court offered the following discussion in its opinion denying post-sentence motions, which we adopt as our own and reproduce verbatim:[2]

> [Appellant] alleges that the Court erred in permitting Det. Weaver to testify regarding statements that [Appellant] told Det. Weaver that Pinkney made to [Appellant]. [Appellant] raised the issue multiple times during the trial and extensive argument was heard regarding the same. The contested statements were the following:
>
> > A: ... And also we talked about, she told me that people were saying that [Pinkney] was involved in the shooting. And she said she asked, confronted him. The first time he denied it, but he was acting real weird. So, she kept pushing it. And [Pinkney] then admitted that him, [Stepoli], and [Hairston] went to [Victim's] house to rob him, because they knew he had a lot of money. And that during the course of the robbery, [Victim] was shot and killed. She said that [Pinkney] apologized, because he said that if he would have known that [Victim] was her godfather, he wouldn't have went.
> >
> > Q: Did [Pinkney] indicate anything about whether or not they were able to complete the robbery?
> >
> > A: No, [Pinkney] told her that they didn't get anything. He said when they were there, [Pinkney] saw a girl go to the door. [Victim] opened the door to let the girl in, and that is when it happened.
>
> N.T. 631. The Defense argued that said statements were "double hearsay" and not within the co-conspirator's exception to the hearsay rule. The Commonwealth argued that [Appellant's] statement to Det. Weaver was a statement of a

_____

[2] We note that the judge authoring the opinion and order denying Appellant's post-sentence motions was not the same judge presiding at Appellant's trial.

party opponent pursuant to Pa.R.E. 803(25)(A) and, as such, was admissible in its entirety (including Pinkney's statements to [Appellant]).

"Hearsay" is a statement that the declarant does not make while testifying at the current trial or hearing and that a party offers in evidence to prove the truth of the matter asserted in the statement. Pa.R.E. 801(c). Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802. A statement offered against an opposing party that was made by the party in an individual or representative capacity is commonly referred to as an admission by a party opponent. 803(25)(A).

Although the Commonwealth argues that Pinkney's statements through [Appellant] are an admission by party opponent, this Court does not make such a finding. Rather, Pinkney's statements offered by [Appellant] through Det. Weaver are hearsay within hearsay. However, this Court agrees with the ruling of the trial court that the statements are excepted by the rule against hearsay under the co-conspirator exception. A statement offered against an opposing party that was made by the party's co-conspirator during and in furtherance of the conspiracy is not excluded by the rule against hearsay, regardless of whether the declarant is available. Pa.R.E. 803(25)(E).

Prior to the Court admitting the above-referenced statements under the co-conspirator's exception to hearsay rule, the Court heard testimony regarding the existence of a conspiracy from [Appellant's] cellmate Amy Calabrese (hereinafter "Calabrese"). Calabrese testified:

> Q: Did you have one conversation with her before your preliminary hearing, or more than one conversation?
>
> A: More than one.
>
> Q: And did she ever talk to you about the nature of the charges that were [filed] against her?
>
> A: Yes.

- 9 -

Q: And what in essence did she tell you about the charges and her involvement in the case?

A: She had told me that it was a, that she had killed somebody. It was a homicide charge.

Q: Did she identify the victim in the case?

A: She said her godfather, she kept saying Snacks.

Q: Did she indicate what led up to that, or what her involvement was?

A: She was at the Wal-Mart on videotape buying the bullets, and those, and that is how they had gotten her for all the charges.

Q: And did she say, identify who was involved?

A: Yes, she said Josh. I remember the name Josh. And then Antoine was the other name, so...

Q: And did she say what they did?

A: She said that they got in the car and all rode together. And she wasn't sure. She said she told the police that she didn't know they were going to do this, but she really did know. Yeah, she said she used her I.D., went into Wal-Mart and bought bullets, and got back in the car.

Q: And did she indicate... [w]hy the bullets were purchased at that time?

A: Yeah, they were going to rob somebody.

Q: Did she say who was going to rob somebody?

A: Her and two other people.

. . .

- 10 -

Q: And did she indicate why this robbery was intended to take place, why they were robbing Snacks?

A: They wanted the money and the drugs.

. . .

Q: Did Miss Hughes indicate anything about what her intentions were in the future...what she wanted to do with her life?

A: She said she thought it was cool to be a drug dealer. That is what she wanted to do to make money.

Q: Now did she indicate what she told the police about her involvement in this case?

A: Yeah, she told the police that she only, that she didn't know what was going on, that she just, she didn't go to the house, and she didn't tell them about the gun that they ended up destroying.

Q: What did she tell you about that?

A: She said that they went to some woman's house and destroyed the gun.

Q: What gun was she referring to, do you know?

A: Whatever gun they used in the robbery, that is what she said.

. . .

Q: Now you indicated that she told you, she related some details that she did following Snacks being shot. What did she say, Amy?

A: She said that she had taken them, they left, and they went and destroyed the gun.

Q: Did she say where they went to destroy the gun?

A: Some woman's house.  She said the police will never find it.

Q: And did she indicate whether or not she actually saw the gun being destroyed?

A: She did say she did see it destroyed.  N.T. 564-570.

After hearing the above testimony, the Court made the following ruling regarding whether to admit Pinkney's statements under the co-conspirator's exception:

Court: After listening to her testimony, I refer you again to the Commonwealth case, Commonwealth vs. Cull.[3]  And Cull indicates that if the conspiracy is ongoing, then the statement would come in as an exception under the co-conspirator rule.  Even though it is close, I think that this witness has established that the conspiracy was ongoing, and this business of covering up the conspiracy was occurring.  Because according to her testimony, whether it is believable or not by the jury, her testimony was-and the jury could believe this-that they went and destroyed the weapon in order to help cover up the crime.  And that fits in with the notion of the ongoing conspiracy rule.

Defense Counsel: And I understand the Court's ruling.  I want to indicate for the record, as I indicated prior, this alleged statement by Earl Pinkney to her, according to Det. Weaver's interview, took place the next evening, approximately at least 18 hours later, even if you would believe that they destroyed this weapon.  So, I would assert for the record that I don't believe the conspiracy was still ongoing at that point.

_____

[3] **Commonwealth v. Cull**, 656 A.2d 476, 481 (Pa. 1995).

Court: Okay, I understand that. But I believe there is at least circumstantial evidence that in this case part of the crime was to continue covering up. N.T. 607-608

This Court agrees with the Trial Court that there was ample evidence that a conspiracy existed and that Pinkney's statement regarding concealing the crime was in furtherance of the conspiracy. Therefore, this Court finds that it was not error for the trial court to admit Pinkney's statement.

Even if Pinkney's statement were improperly admitted, any error was harmless. In harmless error analysis, the Commonwealth has the burden of proving beyond a reasonable doubt that the error could not have contributed to the verdict. Commonwealth v. Moore, 937 A.2d 1062, 1073 (Pa. 2007); Commonwealth v. Mitchell, 839 A.2d 202, 214 (Pa. 2003). An error may be deemed harmless, inter alia, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. Id. (internal citations omitted).

After review of the entire record, the Commonwealth's argument regarding this issue is persuasive. Evidence of a robbery was clear in that Manges and Calderone, who were inside Victim's home at the time of the killing, testified that individual(s) were attempting to force open the back door as Victim attempted to close the door before shots were fired and Victim was killed. N.T. 151-155. A substantial amount of drugs and money were on the kitchen table at the time of the killing. N.T. 361-366. Stepoli told [Appellant] that Stepoli intended to "hit a lick" (to commit a robbery). N.T. 628-630. [Appellant] used her identification to purchase ammunition at Wal-Mart at 9:12 p.m. on December 2, 2012. N.T. 221-223; 626-628. The killing of Victim took place at approximately 12:25 a.m. on December 3, 2012. N.T. 348. Calabrese testified that [Appellant] admitted to her that [Appellant] was engaged in a robbery for drugs and money from Victim. N.T. 564-567.

Pinkney's statement implicated himself in the crime and potentially assisted [Appellant] in that Pinkney's statement contradicted Calabrese's testimony regarding [Appellant's] statements to Calabrese. Additionally, Pinkney's statements did

not implicate [Appellant] in the crime. For the aforementioned reasons, this Court finds that if it was error to admit Pinkney's statements under the co-conspirator exception to the rule against hearsay, any error was harmless because any prejudicial effect of the alleged error was so insignificant that it could not have contributed to the jury's verdict.

Trial Court Opinion, 12/23/14, at 19-24. We agree with the trial court that the statement was properly admitted, and we conclude that Appellant's contrary claim lacks merit.

Appellant next argues that there was insufficient evidence to support her convictions. Appellant's Brief at 26-28. Appellant asserts there was insufficient evidence that the men who shot the victim were attempting to commit a robbery because there was no evidence that anything was taken from the victim's home, and that Appellant's use of her driver's license to assist in the purchase of bullets was insufficient to establish a conspiracy.

When reviewing a challenge to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. *Commonwealth v. Duncan*, 932 A.2d 226, 231 (Pa. Super. 2007) (citation omitted). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Id*. (quoting *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa. Super. 2005)). However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by

means of wholly circumstantial evidence. *Id*. Moreover, this Court may not substitute its judgment for that of the fact finder, and where the record contains support for the convictions, they may not be disturbed. *Id*. Lastly, we note that the finder of fact is free to believe some, all, or none of the evidence presented. ***Commonwealth v. Hartle***, 894 A.2d 800, 804 (Pa. Super. 2006).

The trial court, in addressing this issue in Appellant's post-sentence motion, provided the following comprehensive discussion, which we adopt:

> In this case, the jury found [Appellant] Guilty of Robbery under a theory of accomplice liability and Guilty of Conspiracy to Commit Robbery. In Pennsylvania, a person is guilty of Robbery, if, in the course of committing a theft, he: (i) inflicts bodily injury upon another. 18 Pa.C.S.A. § 3701(a)(1)(i). An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or if in flight after the attempt or commission. 18 Pa.C.S.A. § 3701(a)(2). Under Pennsylvania law, a defendant can be proved liable for the conduct of another person(s) when the defendant is an accomplice of the person who actually commits the crime:

> > (a) General rule. - a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

> > [* * *]

> > (c) Accomplice defined. - A person is an accomplice of another person in the commission of an offense if:
> > > (1) with the intent of promoting or facilitating the commission of the offense, he:
> > > > (i) solicits such other person to commit it; or
> > > > (ii) aids or agrees or attempts to aid such
> > > other person in planning or committing it; or
> > > (2) his conduct is expressly declared by law to establish his complicity.

- 15 -

18 Pa.C.S.A. § 306(a),(c)(1)-(2). In Commonwealth v. Rega, the Pennsylvania [Supreme] Court explained:

> An accomplice is one who "actively and purposefully engages in criminal activity [and is] criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor." Accordingly, two prongs must be satisfied for a person to be labeled an "accomplice." First, there must be evidence that the person intended to aid or promote the underlying offense. Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid.

933 A.2d 997, 1015 (Pa. 2007) (internal citations omitted). For purposes of accomplice liability, "[n]o agreement is required, only aid." Commonwealth v. Kimbrough, 872 A.2d 1244, 1251 (Pa. Super. 2005). With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him or her in committing or attempting to commit the crime. Commonwealth v. Murphy, 844 A.2d 1228, 1234 (Pa. 2004). The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice. Commonwealth v. Gladden, 665 A.2d 1201, 1209 (Pa. Super. 1995) (internal citations omitted).

[Appellant] argues that there is insufficient evidence to show that [Appellant] had the intent of promoting or facilitating the commission of the robbery and/or that, even assuming that [Appellant] was aware that the individual was planning to commit a robbery, merely agreeing to provide a driver's license to allow an individual to purchase bullets is also insufficient evidence of [Appellant's] guilt. [Appellant] also argues that there was insufficient evidence for the jury to conclude that [Appellant] was an accomplice to robbery because the jury would also have had to conclude that there was proof beyond a

reasonable doubt that Stepoli and/or Hairston engaged in the robbery.

The Commonwealth argues that there was sufficient evidence to support [Appellant's] conviction for robbery.

Although this Court did not conduct the trial in this matter, Judge Alfred Bell addressed this issue when, at the close of the Commonwealth's case-in-chief, [Appellant] made a motion for Judgment of Acquittal. The following exchange occurred:

Defense Counsel: Well, Your Honor, I make a motion for Judgment of Acquittal on all the charges. I don't believe there is sufficient evidence to allow this jury to deliberate. I don't believe there is sufficient evidence to show that the individuals that [Appellant] is alleged to have assisted in this crime actually committed the crime. And I don't believe there is sufficient evidence to show there was an agreement to commit this crime.

Commonwealth: Your Honor, as to the proving who actually committed the crime, [Appellant] has told the Court through Detective [Robert] Weaver, that her boyfriend[,] Earl Pinkney, said that he, and Josh Stepoli, and Antoine Hairston went there to rob [Victim].

Court: Even not considering that; there is circumstantial evidence that Stepoli and Hairston purchased the ammunition, and had told [Appellant] that they were going to commit a robbery, within two hours or three hours of the time of the killing. So, that is circumstantial evidence, even disregarding her statement.

Commonwealth: And so obviously, there is an agreement in this case, because [Appellant] agreed to aid them in the robbery, because she bought the bullets for them, she knew they were going to commit a robbery before they went to Wal-Mart, and she bought the bullets, that obviously facilitated the robbery, and was an aid to them in committing the robbery.

- 17 -

> Court: There was sufficient evidence in the record, if believed by the jury, that [Appellant] entered into an agreement to at least aid. That is the jury's determination. That is why we are here. But there is testimony by the statement to Det. Weaver that she said, and we have a videotape showing her actually buying the ammunition, handing the money to the clerk and receiving the bullets, and carrying them out in a bag. And she said that she knew prior to that, in her statement to Weaver, if believed by the jury, that she knew they were going to commit a robbery.
>
> Now there is no time frame expressed. Det. Weaver didn't say she said when it was going to happen, but at least by her statement that the ammunition was being purchased for the purpose of being used in a robbery, so your motions are denied.

N.T. 711-714.

This Court, having reviewed the entire record in this case, finds no error in Judge Bell's determination that there was sufficient evidence for the jury to deliberate. Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence to support [Appellant's] conviction for robbery. As noted above, the amount of aid provided to the principal need not be substantial. This Court finds that [Appellant] intended to promote or facilitate the robbery, and that [Appellant] provided substantial aid to the commission of the robbery by purchasing the bullets that [Appellant] knew would be used in the robbery. By [Appellant's] own statement to Det. Weaver, at a minimum, [Appellant] knew prior to the robbery that Stepoli and Hairston intended to commit a robbery. [Appellant] knew that Stepoli, Hairston, and her boyfriend, Pinkney had committed robberies together in the past, and that they used guns during those robberies. Yet, [Appellant] willingly purchased the ammunition at Wal-Mart knowing that said ammunition would be used to "hit a lick" (commit a robbery).

[Appellant] also argues that there was insufficient evidence for the jury to conclude that [Appellant] was an accomplice to

- 18 -

robbery because the jury would have had to conclude beyond a reasonable doubt that Stepoli and/or Hairston engaged in the robbery. [Appellant] raised this issue at trial and was granted an instruction by the Court which required the jury to conclude beyond a reasonable doubt that all of the elements of the offensive robbery had been met against Stepoli and/or Hairston prior to concluding that [Appellant] would be guilty of robbery. N.T. 795-800. Evidence was presented at trial that there was drug paraphernalia, a large amount of money, and numerous types of drugs at Victim's residence. [Appellant] argues that there was no money, drugs, or anything else taken from Victim's home the night Victim was shot. However, robbery does not require that the crime be completed; one can be guilty of robbery by attempting to commit robbery.

Further, [Appellant's] admissions presented at trial through Det. Weaver and Calabrese provide circumstantial evidence that Stepoli and/or Hairston engaged in an attempted robbery. Evidence was presented at trial that three men attempted to gain entry into Victim's house and that, after Victim resisted said entry, at least one of the suspects fired a gun through a door which resulted in Victim being shot and killed. Additional evidence was presented at trial by eyewitness Morris to the approximate height of the three suspects and further circumstantial evidence was presented at trial by Det. Dupilka regarding Stepoli, Hairston, and Pinkney's height. As indicated above, it is the sole province of the fact finder to determine the credibility and to believe all, part or none of the evidence presented. In the case sub judice, based on the evidence presented, a jury could reasonably infer that there was sufficient evidence presented to support the convictions of Robbery and Conspiracy to Commit Robbery. Viewing all of the evidence in a light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences therefrom, the evidence was sufficient to support the jury's verdict of guilty of the charges.

Trial Court Opinion, 12/23/14, at 14-17 (some citations omitted). In light of

the testimony of Detective Weaver that Appellant admitted to purchasing

ammunition identical to that used in the robbery and the testimony from

Amy Calabrese that Appellant admitted to planning the robbery and

transporting the co-conspirators, we are constrained to agree with the determination reached by the trial court. Thus, Appellant's challenge to the sufficiency of the evidence lacks merit.

Appellant last argues that the verdict was against the weight of the evidence. Appellant's Brief at 22-25. Appellant alleges that the jury improperly gave greater weight to the fact that the Victim was killed over the facts surrounding Appellant's involvement in the crime and should have given greater weight to the fact that the perpetrators did not enter the home after the Victim was shot which establishes that a robbery was not contemplated.

In **Commonwealth v. Clay**, 64 A.3d 1049 (Pa. 2013), our Supreme Court set forth the following standards to be employed in addressing challenges to the weight of the evidence:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751-[7]52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 A.2d at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id**. at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Brown**, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Widmer**, 560 Pa. at 321-[3]22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> *Widmer*, 560 A.2d at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184-[11]85 (1993)).

*Clay*, 64 A.3d at 1054-1055. "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 949 A.2d 873, 879-880 (Pa. 2008).

Our review of the record reflects that the trial court addressed Appellant's challenge to the weight of the evidence and determined that it lacked merit. Specifically, the trial court stated the following with regard to Appellant's challenge to the weight of the evidence supporting her convictions:

> [Appellant] argues that the jury gave greater weight to the evidence of the killing of Victim by the robbers than the actual facts of [Appellant's] involvement. However, the jury acquitted [Appellant] of the killing and only convicted [Appellant] of the crimes with regard to robbery. The jury was certainly capable of determining whether to believe all, part, or none of the evidence with respect to whether the Commonwealth met its burden in charging [Appellant] with Robbery and Conspiracy to Commit Robbery. Based upon this Court's review of the entire record, this Court does not find that the jury's verdict is so contrary to the evidence as to shock this Court['s] sense of justice. Therefore, this Court does not find that the jury's verdict was against the weight of the evidence.

Trial Court Opinion, 12/23/14, at 18.

The jury, sitting as the finder of fact, was free to believe all, part, or none of the evidence against Appellant, as was its right. The jury weighed the evidence and concluded Appellant perpetrated the crimes in question. This determination is not so contrary to the evidence so as to shock one's

sense of justice. We decline Appellant's invitation to assume the role of fact finder and to reweigh the evidence. Accordingly, we conclude that the trial court did not abuse its discretion in determining Appellant's weight of the evidence claim lacked merit. Thus, this claim fails to provide Appellant relief.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/25/2016

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   )
                                   )
           vs.                )    NO.   429 C 2013
                                   )

CHALSEE L. HUGHES              )

### OPINION AND ORDER OF COURT

The above-captioned case is before this Court for the disposition of the defendant's Post Sentence Motions filed pursuant to Pennsylvania Rules of Criminal Procedure 720(B). The defendant, Chalsee L. Hughes (hereinafter "Defendant") was charged with the following crimes[1]:

Count 1- Murder of the Second Degree, in violation of 18 Pa.C.S.A. § 2502(b), 2nd degree homicide.

Count 2- Murder of the Third Degree, in violation of 18 Pa.C.S.A. § 2502(c), 1st degree felony.

Count 3- Criminal Conspiracy (to commit homicide), in violation of 18 Pa.C.S.A. § 903(a)(1), 1st degree felony.

Count 4- Robbery, in violation of 18 Pa.C.S.A. § 3701(a)(1)(i), 1st degree felony.

Count 5- Criminal Conspiracy (to commit Robbery), in violation of 18 Pa.C.S.A. § 903(a)(1), 1st degree felony.

The charges stem from an investigation by Officer David Yuhasz of the City of Monessen Police Department into the shooting death of Christopher Fincik at his home on December 3, 2012, in the City of Monessen, Westmoreland County.

Following Defendant's arrest, Magisterial District Judge Joseph Dalfonso conducted a preliminary hearing on January 28, 2013, and held the case for court. A criminal information was filed charging Defendant with the above-mentioned crimes. Defendant filed a Motion to Set Bond and a Petition for Writ of Habeas Corpus. Following a hearing on May 21, 2013, the motion and petition were denied by the Court on August 26, 2013. On October 23, 2013, counsel for

---

[1] The criminal information initially included a charge of Murder in the First Degree, but said criminal information was subsequently amended and the offense of Murder of the First Degree was deleted.



Defendant filed a Motion to Withdraw, which was granted on October 24, 2013. New counsel was appointed on October 25, 2013.

A Motion to Suppress was filed by present counsel. Following a hearing on February 27, 2014, said motion was denied. Jury selection commenced on March 3, 2014, and a trial by jury was conducted on March 25, 2014.

On April 2, 2014, following a seven day jury trial, Defendant was found Guilty of Robbery and Conspiracy to Commit Robbery and Not Guilty of the remaining charges. Defendant was sentenced by the Court on July 1, 2014, to a period of incarceration of not less than 54 months for the offense of Robbery and an identical sentence concurrent to that sentence for the offense of Criminal Conspiracy to Commit Robbery. Defendant timely filed the Post-Sentence Motions presently before this Court.

Defendant alleges the following:

I.     The Commonwealth failed to present sufficient evidence for the jury to reach the verdict of guilty to the charge of Robbery as an accomplice and guilty to the charge of Conspiracy to Commit Robbery.

II.    The verdict was against the weight of the evidence.

III.   The trial court erred in precluding Defendant from presenting evidence and arguing that the Commonwealth failed to charge the two alleged co-conspirators.

IV.   The trial court erred in allowing hearsay testimony of Earl Pinkney regarding his involvement in the shooting of Chris Fincik through Detective Robert Weaver who obtained the statement from Defendant during an interview.

V.    The trial court erred in directing that Defendant make payment for the cost of the autopsy of the deceased.

## FACTS

During the early morning hours of December 3, 2012, Christopher Fincik (hereinafter "Victim") was shot and killed at his residence, 902 Maple Avenue, in the City of Monessen. N.T. March 25-April 2, 2014, 329, 348, 352 (hereinafter "N.T.").[2]  Witness and Victim's neighbor,

---

[2] March 25-April 2, 2014 are the trial dates. To decrease the length of each citation, the notes of testimony regarding the trial dates will hereafter be referred to as "N.T.". References to any other hearing and/or matter in this case shall include the date of said proceeding.



Daniel Evangelist (hereinafter "Evangelist") testified that, around 11:30 p.m. on December 2, 2012, while in the second story bathroom of his home, he heard a loud male voice right beneath his window. N.T. 41-42. Evangelist testified that it sounded as if the male was on the phone when the male stated, "as soon as somebody gets here [we're] goin' to do a hit." N.T. 42-43. At around 12:20 a.m. on December 3, 2012, Evangelist called 911 after hearing approximately four gun shots. N.T. 45-46.

Witness Miranda Morris (hereinafter "Morris"), who identified herself as the victim's girlfriend, testified that, on December 3, 2012, at approximately 12:00 a.m., living in close proximity to each other, she walked from her house towards Victims' house.[3] N.T. 106, 107, 109. Morris indicated that, as she approached the edge of victim's property, which was well lit by the victim's back porch light, she could see another female, whom she knew to be Rachel, on the right side of Victim's house. N.T. 110. Morris stated that she watched Rachel knock on the back door, saw Victim open the door, watched Rachel enter Victims' residence, and heard Victim tell Morris to "watch her step." N.T. 111-112.

Estimating that she was approximately ten to twelve feet away from Victim's back door, Morris testified that she next saw three men coming around the left side of Victim's home. As Morris told Victim to shut the door, the men were approximately one foot in front of the back door and the tallest of three "started shooting." N.T. 114, 117. Being unable to see any of the men's faces due to their black masks, Morris described two of the men as at least six feet tall, with one of the taller men being considerably more than six feet tall, and one of the men shorter than six feet tall.[4] N.T. 115. Morris estimated that the shortest of the three was probably around her height, which is 5'6", or shorter. N.T. 116.

When asked directly whether she knew Josh Stepoli (hereinafter "Stepoli") at the time of the shooting, Morris stated that she did. N.T. 124-125. Morris described Stepoli as very tall and stocky. N.T.. 125. When asked if the person Morris described as the tallest of the three was similar to Stepoli's size back in December of 2012, Morris stated "Yes." N.T. 125. Along the same lines, Morris stated that she knew Earl Pinkney (hereinafter "Pinkney") at the time of the shooting and

---

[3] Morris testified that she resided on Locust Avenue, which road was located directly behind victim's property. As such, Morris testified that when she walked down her road towards the victim's property, she would end up at victim's backyard. To enter victim's house, Morris would walk through victim's backyard and enter the victim's house through the backdoor. N.T. 106, 109.

[4] Morris estimated that the shorter person was "maybe my height, or even a shorter." Morris testified that she is 5'6". N.T. 116.

that Pinkney's size was similar to the second tallest person of the three. N.T. 125-126. Again being asked directly whether she knew Antoine Hairston (hereinafter "Hairston") at the time of the shooting, Morris stated that she did and that she had known Hairston since he was little. N.T. 126. Morris testified that Hairston's size at the time of the shooting was similar to the shortest of the three men involved in the shooting. N.T. 126.

Although she was only approximately two to three feet from the three men at the time of the shooting, Morris was not able to identify any of the men any further. N.T. 126, 131. On cross-examination, Morris did not know the exact height of the three men or their exact weight. N.T. 139. Morris also admitted that, although she testified that she knew specific men of similar size and height of each of the three, she also knew other people in the city of Monessen that might have similar size and shape of the three. N.T. 139.

Regarding which of the three was carrying any weapons, Morris testified that the shortest of the three had a small handgun, the tallest of the three had a black long gun that was not a shotgun, rather an AK-47, and that, although she didn't see whether the other man had a gun, she couldn't say conclusively whether or not he did. N.T. 116-117, 141-142. When questioned specifically about which of the three was the shooter that she had described, Morris stated that the tallest of the three was the shooter. N.T. 117.

Morris further testified that sometime during the shooting, she ran back to her home, and from her first floor porch[5], she saw three men running from Maple Street uphill on a path to a wooded area. N.T. 117-119. Other then seeing the three men, Morris stated that she saw Rachel [Manges][6] (hereinafter "Manges") run out of victim's front door a minute later. N.T. 120. Within a couple of minutes, Manges, who was frantic with blood all over her shirt, came to Morris's house. N.T. 121. Morris recalled Manges telling her to call 911, but was unable to recall anything additional that Manges had said to her. N.T. 124.

There were two witnesses, Rachel Manges (hereinafter "Manges") and Robert Calderone (hereinafter "Calderone") who were in Victim's house at the time of the shooting. Manges testified that Victim was a good friend of eight years at the time of the shooting and that she entered Victim's residence through the same back door where the shooting occurred just moments before it

---

[5] Morris testified that her first floor porch was elevated above victim's house on Maple Street. N.T. 118.
[6] Although Miranda Morris testified that she did not know Rachel's last name, Rachel Manges testified that she was the "Rachel" who Miranda encountered on that night. Monessen Police Officer David Yuhasz also indentified "Rachel" as Rachel Manges. N.T. 351.



happened. N.T. 146, 152. Manges testified that she generally entered through the back door because the front door was blocked off. N.T. 147. Wwhen she walked along the side of the house towards the back of the house, she did see someone walking from the backyard towards the house, but didn't recognize or say anything to the person. N.T. 149-150.

Manges testified that when Victim opened the back door, she entered the kitchen and saw Calderone sitting at the kitchen table. N.T. 151. All of a sudden, Victim was trying to shut the back door. N.T. 152. By holding the palms of her hands in the air, with her left hand and arm a little bit higher than her right hand, Manges demonstrated how Victim was struggling to push the door closed while a force on the other side was trying to come into the house. N.T. 152-153. Manges stated that the struggle lasted only seconds before she heard gunfire. N.T. 154. Victim was able to get the door shut but, after hearing six gun shots before she heard ringing, Manges saw that Victim was shot and limping. N.T. 155-156. Manges and Victim made it to the living room, where Victim fell onto the landing next to the steps, partially blocking the front door. N.T. 157, 159. Realizing that Victim was dying, Manges left to get help. N.T. 157-158. Manges testified that, as she got into her car, she yelled up to Morris (who was on her front porch) to call 911. N.T. 159.

The other witness present in the house at the time of the shooting was Calderone. Calderone testified that Victim was one of his best friends and that he was "hanging out" at Victim's house for ten to fifteen minutes before the shooting occurred. N.T. 174-175. Calderone and Victim were sitting at the kitchen table when Manges knocked on the back door. N.T. 176. Victim let Manges in and when the door was about a foot from being closed, all of a sudden, somebody was trying to push it open. N.T. 176. Calderone testified that Victim put his foot in front of the door, put his arms up on the door, and was blocking to stop whoever was trying to come in. N.T. 176-177. Calderone demonstrated this by putting his arms up about chest or shoulder level with his palms facing out. N.T. 177. Calderone testified that, after Victim struggled with the door for a few seconds, Calderone heard shots being fired. N.T. 178, 180. Calderone ran out of the front door after being shot in the chest. N.T. 178, 179. After jumping off the front porch, Calderone turned left, looked, and saw three or four kids in all black running up Maple Street to the left. N.T. 179. Calderone was about 30 feet from the three or four kids when he saw them and was not able to identify them other than stating that they all looked about his size.[7] N.T. 184.

---

[7] Calderone testified that he is 5'9" to 5'10" and approximately 135 lbs. N.T. 189.



At 12:25 a.m. on December 3, 2012, City of Monessen Police were dispatched to the 900 block of Maple Avenue and then directed by Manges[8] to the home of Christopher Fincik (hereinafter "Victim"). N.T. 348-352. Officer David Yuhasz and Lieutenant Fronzaglio arrived at 902 Maple Avenue and found Victims' lifeless body lying inside the residence blocking the front door. N.T. 351-353. Officer Yuhasz and Lt. Fronzaglio walked to the rear door of the residence which they found to have bullet holes and shattered glass. N.T. 353-354. Prior to the shooting, the rear door was a single pane of glass with window pane dividers that made it look as if each pane was a separate piece of glass. N.T. 502, 503. Each glass section of the rear door was covered with paper towels which would have prevented anyone from the outside seeing through the glass window panes. N.T. 140, 166, 180-181

Upon entering the kitchen area through the rear door, Officer Yuhasz observed objects on the table, that the kitchen was in disarray with blood on the walls and floor, and chairs overturned. N.T. 335. Officer Yuhasz followed a path a blood from the kitchen to the living room to a landing near the front door where Victim, who immediately appeared to be deceased, was found. N.T. 356-359. Upon further investigation of the kitchen, Officer Yuhasz observed what was later confirmed to be 390 packets of heroin, one baggie of cocaine weighing 82.8 grams, one baggie of cocaine weighing 46.5 grams, $3,241.00, two digital scales, a hotel room key card, one box of Clover Valley baking soda, one container of Inositol powder,[9] baggies, and other packaging devices for drugs on the kitchen table. N.T. 359, 361-365.

Officer Yuhasz testified that, other than officials investigating the scene, there were no other people in the residence. N.T. 357. Yuhasz stated that investigators did recover a .32 caliber Kel-Tec semi-automatic pistol hidden in the second story attic staircase behind two pieces of unfinished lumber. N.T. 416. Yuhasz stated that although there were no rounds in the chamber, the magazine did have bullets in it. N.T. 417. A second pistol, a .45 caliber Springfield Arms, was found under a floorboard in the basement stairwell. N.T. 417, 504. Said pistol also had bullets in the magazine. N.T. 417. The investigation continued with the interviews of numerous witnesses and having Detectives from the Westmoreland County District Attorney's Office review the crime scene, take

---

[8] Officer Yuhasz testified that he saw a white vehicle pulling away from in front of the area of 902 Maple, and when he followed the vehicle, Rachel Manges stopped the car and jumped out. N.T. 351. Officer Yuhaz further testified that, with blood all on her front shirt, Manges screamed, "He is shot. Got check on him. He is shot...Snacks [referring to Christopher Fincik]." N.T. 351.

[9] Officer Yuhasz testified that baking soda and Inositol powder are commonly used in drug trafficking for preparing, cutting, and expanding the quantity of the controlled substance. N.T. 365.



photographs, collect physical evidence, and do additional forensic evaluations. N.T. 385-528. Of particular importance, three discharged cartridge casings, collected by the investigators, were found in the grass adjacent to the back porch area. N.T. 482, 492-493. Two of those cartridge casings were Winchester 7.62 x 39 and one was Tulammo 7.62 x 39. N.T. 281. Those shell casings were submitted to the Pennsylvania State Police Regional Crime Lab for review by the Serology Department as well as the DNA Department. N.T. 724-730.

Dr. Cyril H. Wecht (hereinafter "Dr. Wecht") performed the autopsy on Victim and testified in this matter as an expert in Forensic Pathology. N.T. 306, 308. Dr. Wecht noted that Victim had gunshot wounds to the chest, abdomen, right forearm, left upper abdomen, and lower chest region. N.T. 312. Dr. Wecht testified that three or four bullets struck Victim. N.T. 332. While testifying about the nature of the wounds, the following exchange occurred:

> Commonwealth: Doctor, I would ask you to assume that Chris Fincik at the time of his death was attempting to close a door, and has been described as having his arms up trying to press the door, probably to press the door closed. And somebody fired from the other side of the door. Would a gunshot be consistent with striking the right arm and then proceeding into the chest area, where you have described the wounds to the upper chest?
>
> Wecht: Yes, if the forearm would be held in this position, that would fit in very logically insofar as directionally is concerned with that wound. And then if it was held in that way, and the wound coming across and continuing on into the chest, yes, that would fit in with such a scenario.
>
> Commonwealth: And simply to the injury to the left side that was just shown in the last photograph, Commonwealth Exhibit 15, again, if he were, Chris Fincik was pressing against the door trying to close the door, and a gunshot was fired through the door, could a trajectory be consistent with going into the area below the armpit and proceeding down and exiting on his side a few inches below the injury that we saw on the photograph?
>
> Wecht: Yes. If the left arm were held out slightly elevated, and then a bullet coming in, yes, would very easily strike. So your hypothetical scenario would fit in with the anatomic locations of these wounds.
>
> Commonwealth: And if Chris Fincik turned so that he, so that his side was to the door, could a gunshot be fired and passed through with the same trajectory as you have seen in the photograph, indicating an entrance and exit wound to his abdomen on both sides of his umbilicus?
>
> Wecht: Yes, where the body then turned somewhat forward, the left part of the body somewhat more forward, and then, or even perhaps even on a perpendicular to a



door or the shooter, the bullets, the two bullets that entered, yes, could come in that would fit in again pretty much on the straight line with one going in and out, and the other going in tangentially, they would all fit with that kind of physical posture. N.T. 318-320.

Dr. Wecht did not find any powder burns, strippling, or tattooing on Victim and explained that he would not expect to see any if the bullets passed through an intermediary object, such as a door, or a door with glass panels. N.T. 320, 323. In his opinion, although the other gunshot wounds caused internal damage, the gunshot wound to the chest, which damaged the right side of Victim's heart, was fatal and caused Victim's death. N.T. 325. Although a toxicology report indicated that Victim had oxycodone, some hydrocodone, and marijuana in his system at the time of his death, Dr. Wecht opined that none of those items contributed to Victim's death. N.T. 331.

On December 4, 2012, police executed an arrest warrant upon Earl V. Pinkney for unrelated offenses and a search warrant of Pinkney's residence at 617 Chestnut Street, Monessen. N.T. 611. Defendant was found at Pinkney's residence and was brought to the Monessen Police Department where she was interviewed by Westmoreland County Detective Robert Weaver (hereinafter "Det. Weaver"). N.T. 612.

As a result of the search of Pinkney's residence, photographs were taken and evidence was seized. N.T. 511. Among other seized items was an empty Tulammo 7.62 x 39 ammunition box which was found in a laundry basket in the converted living quarters of a basement. N.T. 513, 515-516. Det. Weaver testified that the basement contained a bed, some furniture, a television set, clothing, and stereo equipment. N.T. 513. Det. Weaver further testified that it appeared that Pinkney was living in the basement because his photo identification, credit cards, and various employment slips were located there. N.T. 513. In a first floor bedroom, a Mossberg 28 pump gauge action shotgun was found. N.T. 516. Outside of the residence, alongside the driver's side rear tire, investigators seized an opened, hard plastic rifle case with foam insert. N.T. 512. Det. Dupilka testified that an AK-47 type gun could fit in said gun case with the gun case being able to close as long as the magazine was removed. N.T. 487, 506.

During Defendant's first interview with Det. Weaver, Defendant waived her Miranda Rights and then advised Det. Weaver that Defendant was dating Pinkney. N.T. 611-613, 618. Defendant stated that, although she was student at California University of Pennsylvania, Defendant would come to Pinkney's home in Monessen on the weekends. N.T. 618. Defendant revealed that on Sunday, December 2, 2012, Defendant stayed with Pinkney "most of the day," went to a friends



house to do her hair, and then came back to Pinkney's home. N.T. 618. Defendant further related that, at approximately 9:30 p.m., she took a friend to Charleroi, got some pizza at the Exxon in Monessen, and went back to Pinkney's where Defendant and Pinkney stayed all night. N.T. 618. When asked, Defendant stated that Pinkney could have gotten up and left without Defendant being aware because Defendant is a deep sleeper. N.T. 619.

Defendant told Det. Weaver that she was made aware of Victim's death on Monday, December 3, 2012, and that Defendant knew that people were accusing Pinkney of being involved. N.T. 619. While at the candlelight vigil, Defendant heard that three people had gone to Victim's house, tried to rob him, and shot him in the stomach. N.T. 620. Defendant denied ever seeing Pinkney with a gun, but admitted that she knew Pinkney and Stepoli had grown up together, and that Pinkney actually lived with Stepoli for awhile. N.T. 620.

On December 5, 2012, Westmoreland County Detective Frank Galilei (hereinafter "Det. Galilei") received information from Monessen Police Chief Mark Gibson (hereinafter "Chief Gibson") that Chief Gibson was made aware that ammunition may have been purchased at the local Wal-Mart in Belle Vernon. N.T. 205. Detectives Galilei and Brown traveled to the Belle Vernon Wal-Mart. N.T. 207-208.

While investigating with the help of Wal-Mart Security Officer Chad Shonts and Asset Protection Manager Cara Landis, the detectives learned that a box of 7 millimeter Winchester shells had been purchased on December 2, 2012, at about 9:12 p.m. N.T. 208, 220. The Detectives were able to obtain the actual video, still shots, and a copy of the sales receipt of said purchase, all of which were admitted at trial without objection. N.T. 208. The actual video and still shots show the interaction between two African American males and one female in the sporting goods section of Wal-Mart and a Wal-Mart associate, Paul Lavins (hereinafter "Lavins"). N.T. 215-217.

Lavins testified that he went over to the ammunition case where the two men were standing. N.T. 237. The taller of the two men did most of the talking while the other male was crouched off to the side and didn't say much and the female was "back off behind the counter." N.T. 237. The taller male asked Lavins about which brand was the best 7.62 caliber ammunition and Lavins advised that Winchester was the best. N.T. 237. After some discussion between the two male customers, Lavins was advised that they were purchasing a box of Winchester 7.62 bullets. N.T. 251-252. Although the young woman had walked away at some point during the discussion, she returned at the point where the bullets were being purchased. N.T. 253. Lavins asked the group for

⑨

the I.D. of whomever was purchasing the bullets and the young female provided her I.D. and cash to pay for the purchase, which included a tube of toothpaste. N.T. 252-253. After checking the female's I.D. to make sure she was at least 18 years old, and ringing in the transaction, Lavins gave the female her change and receipt. N.T. 241, 252-254.

Monessen Police Officers, who were familiar with Defendant, Stepoli, and Hairston, identified the three as the three subjects in the video and still shots from Wal-Mart. N.T. 622. Believing that Defendant was in Wal-Mart at 9:20 p.m. on December 2, 2012, along with Stepoli and Hairston purchasing 7.62 caliber, the same caliber of ammunition found at the crime scene, Det. Weaver interviewed Defendant a second time on December 5, 2012. N.T. 621-622.

After advising Defendant of her Miranda Rights and with Defendant executing a Waiver of the same, Det. Weaver advised Defendant that investigators obtained information that she had gone to Wal-Mart and purchased ammunition consistent with the ammunition that was found at the crime scene. N.T. 626. Detective Weaver testified regarding Defendant's response after being confronted with that information:

> A: And so she knew before I started talking to her why she was there. And at that time she said, yeah, I went to Wal-Mart. I bought the bullets. That was her first statement. N.T. 627

*** 

> A: Initially she told me that she had gone to Charleroi with Josh and Antoine, Josh Stepoli and Antoine Hairston. And on the way back, Josh told her he wanted to look at some bullets up at Wal-Mart...Then on the way back, driving to Wal-Mart, she, she said that Josh said he wanted to look at some bullets. And she said she needed toothpaste anyways. So they just stopped at Wal-Mart, went in, and she stayed while they were in there. And Josh told her he didn't have his I.D., so would she use her I.D. to purchase the ammunition? And she agreed to do it. N.T. 626-627

*** 

> A: She said then they started driving back to Monessen, and that is—and then I asked her—that is what she had told me before, about Josh wanted to look at bullets. Well, I asked her, you know, was anything said about what Josh was going to do? And she said Josh told her that he was going to quote "hit a lick." And I had no idea what that meant. So I asked her what that meant. And she said it meant he was going to rob somebody. And this was in the car on their way to Wal-Mart, before the bullets were purchased. N.T. 629-630

*** 

10

Q: What did she think about the fact they were going to commit a robbery?
A: She told me that that is not unusual, because she knows that Earl, and Josh, and Antoine rob a lot of people. She said they usually do it out of town. They don't do it in Monessen. So, she really didn't think much of it, because it wasn't going to happen in Monessen. N.T. 630

Q: Did she indicate anything about how these robberies were carried out?
A: She said the three of them always each carry a gun, and they rob people. N.T. 630

Q: Was she able to specify the type of firearm they carried?
A: She said that Earl usually carries the shotgun that we found in his home. That is what he usually takes to the robberies. N.T. 630

Q: What else did she tell you during this interview, if you recall?
A: She always said, when they got back to Earl's house...She was tired and went to bed. Earl got into bed with her.

About 2 a.m. she woke up, and there was a text message that Snacks had been murdered, and she said that Earl was in bed with her at the time. And also we talked about, she had told me that people were saying that Earl was involved in the shooting. And she said she asked, confronted him. The first time he denied it, but he was acting real weird. So, she kept pushing it. And Earl then admitted that him, Josh, and Antoine went to Snacks' to rob him, because they knew he had a lot of money. And that during the course of the robbery, Snacks was shot and killed.

She said that Earl apologized, because he said that if he would have known that Snacks was her godfather, he wouldn't have went. N.T. 630-631

Q: Did Earl indicated anything about whether or not they were able to complete the robbery?
A: No, Earl told her that they didn't get anything. He said when they were there, Earl saw a girl go to the door. Snacks opened the door to let the girl in, and that is when it happened. N.T. 631-632.

Although Defendant was released following the statement she provided to Det. Weaver, on or about December 21, 2012, Defendant was later arrested and charged with the aforementioned counts. Regarding the Conspiracy to Commit Robbery, Defendant was alleged to have conspired with Stepoli, Hairston, and/or Pinkney. At trial, counsel for Defendant objected to Det. Weaver testifying to what Defendant stated that Pinkney had told her as "double hearsay". The Commonwealth argued that Defendant's entire statement, including the statements she told Weaver that Pinkney had told her, were admissions by party opponent. The Court did not agree with the

Commonwealth regarding Pinkney's alleged statements to Defendant, but preliminarily considered whether said statements were admissions by co-conspirator in furtherance of the conspiracy. After extensive argument on both sides, the Court overruled the objection and allowed the statement to come in.

Prior to the above-referenced interviews and prior to the court making its determination regarding Pinkney's statements, the Commonwealth presented evidence that, while incarcerated at the Westmoreland County Prison, Defendant met Amy Calabrese (hereinafter "Calabrese"). Calabrese testified that Defendant informed Calabrese that at the time Defendant purchased ammunition at Wal-Mart, Stepoli and Hairston intended to rob Victim because they knew Victim had money and drugs. N.T. 564-566. Calabrese also related that Defendant drove Stepoli and Hairston to the robbery and that Stepoli shot Victim in the stomach. Lastly, Calabrese testified that Defendant was present when the weapon that was used in the attempted robbery was destroyed. N.T. 567, 568.

Calabrese's testimony was presented prior to Det. Weaver in anticipation of Defendant's hearsay objection regarding Pinkney's statements to Defendant. For the reasons explained later in this Opinion, the Court determined that, as a result of Calabrese's testimony, Pinkney's statements to Defendant were admissible under the co-conspirator's exception to the hearsay rule.

Westmoreland County Detective Raymond Duplika (hereinafter "Det. Dupilka") testified for the Commonwealth regarding frontal photographs of Stepoli, Pinkney, and Hairston to show their respective heights. N.T. 485. The photographs show that Stepoli was approximately 6'6" to 6'7", Pinkney was 6'1" to 6'2", and Hairston was 5'8".[10] N.T. 486-487.

After the Commonwealth rested, the Defendant called two experts and two character witnesses. The defense called Pennsylvania State Police Greensburg Regional Laboratory Forensic Scientist Superior Sara Kinneer as an expert in Serology. N.T. 725-726. Relative to this case, Ms. Kinneer received a whole blood sample from the victim, two Winchester 7.62 x 39 casings, and one Tulammo 7.62 x 39 casing. N.T. 727. Ms. Kinneer testified that she prepared the blood sample for DNA analysis, and that she looked over the shell casings to see if there was any kind of staining, but that she didn't notice any. N.T. 730-731. Ms. Kinneer then took one sterile swab and swabbed both Winchester casings, and used a separate swab for the Tulammo casing. N.T. 731. When asked why she would not use one swab for each casing, Ms. Kinneer explained that they would use the

---

[10] Said photographs were taken on March 24, 2014.

same swab for each brand of ammunition to try to concentrate as much DNA as possible on that swab. N.T. 734. Ms. Kinneer then prepared the swabs for DNA analysis and sent the swabs and the blood sample to the Forensic DNA Division to be analyzed. N.T. 732.

The defense called Pennsylvania State Police Forensic DNA Scientist Joseph Kukosky as a DNA expert. N.T. 736. Mr. Kukosky testified that he obtained the items of evidence detailed by Ms. Kinneer to analyze them for the presence of human DNA. N.T. 736. Mr. Kukosky testified that, from the swab of the Winchester casings, he was able to obtain a partial DNA profile, and that said profile matched the DNA standard of Victim. N.T. 739. Mr. Kukoksy related that for the Caucasian population, the probability of finding someone else within the same racial category with the same DNA profile was one in 73 million. N.T. 740. Mr. Kukosky further testified that the amount of DNA on the Winchester casings swab was a very small amount and that there was an insufficient amount of DNA on the Tulammo swab to make a DNA profile. N.T. 742-743.

## DISCUSSION

**Issue: Whether there was sufficient evidence to prove the defendant's guilt beyond a reasonable doubt?**

Defendant challenges the sufficiency of the evidence to prove Defendant committed the crime of robbery as an accomplice. Although Defendant states that the Commonwealth failed to present sufficient evidence for the jury to reach the verdict of guilty to the charge of Conspiracy to Commit Robbery, Defendant offers no argument or authority to support its contention. (Def.'s Br. 6). In Commonwealth v. Brown, the Pennsylvania Superior Court stated:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence



actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

23 A.3d 544, 559-560 (Pa. Super. 2011) *(en banc)* citing Commonwealth v. Hutchinson, 947 A.2d 800, 805–06 (Pa.Super.2008), appeal denied, 602 Pa. 663, 980 A.2d 606 (2009) (quoting Commonwealth v. Andrulewicz, 911 A.2d 162, 165 (Pa.Super.2006)).

In this case, the jury found Defendant Guilty of Robbery under a theory of accomplice liability and Guilty of Conspiracy to Commit Robbery. In Pennsylvania, a person is guilty of Robbery, if, in the course of committing a theft, he: (i) inflicts bodily injury upon another. 18 Pa.C.S.A. § 3701(a)(1)(i). An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or if in flight after the attempt or commission. 18 Pa.C.S.A. § 3701(a)(2). Under Pennsylvania law, a defendant can be proved liable for the conduct of another person(s) when the defendant is an accomplice of the person who actually commits the crime:

> (a) General rule. – a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.
>
> (c) Accomplice defined. – A person is an accomplice of another person in the commission of an offense if:
>> (1) with the intent of promoting or facilitating the commission of the offense, he:
>>> (i) solicits such other person to commit it; or
>>> (ii) aids or agrees or attempts to aid such other
>> person in planning or committing it; or
>> (2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306(a),(c)(1)-(2). In Commonwealth v. Rega, the Pennsylvania Superior Court explained:

> An accomplice is one who "actively and purposefully engages in criminal activity [and is] criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor." Accordingly, two prongs must be satisfied for a person to be labeled an "accomplice." First, there must be evidence that the person intended to aid or promote the underlying offense. Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid.



933 A.2d 997, 1015 (Pa. 2007) (internal citations omitted). For purposes of accomplice liability, "[n]o agreement is required, only aid." Commonwealth v. Kimbrough, 872 A.2d 1244, 1251 (Pa. Super. 2005). With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him or her in committing or attempting to commit the crime. Commonwealth v. Murphy, 844 A.2d 1228, 1234 (Pa. 2004). The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice. Commonwealth v. Gladden, 665 A.2d 1201, 1209 (Pa. Super. 1995) (internal citations omitted).

Defendant argues that there is insufficient evidence to show that Defendant had the intent of promoting or facilitating the commission of the robbery and/or that, even assuming that Defendant was aware that the individual was planning to commit a robbery, merely agreeing to provide a driver's license to allow an individual to purchase bullets is also insufficient evidence of Defendant's guilt. (Def.'s Br. 7). Defendant also argues that there was insufficient evidence for the jury to conclude that Defendant was an accomplice to robbery because the jury would also have had to conclude that there was proof beyond a reasonable doubt that Stepoli and/or Hairston engaged in the robbery. (Def.'s Br. 8).

The Commonwealth argues that there was sufficient evidence to support Defendants' conviction for robbery.

Although this Court did not conduct the trial in this matter, Judge Alfred Bell addressed this issue when, at the close of the Commonwealth's case-in-chief, Defendant made a motion for Judgment of Acquittal. The following exchange occurred:

> Defense Counsel: Well, Your Honor, I make a motion for Judgment of Acquittal on all the charges. I don't believe there is sufficient evidence to allow this jury to deliberate. I don't believe there is sufficient evidence to show that the individuals that Miss Hughes is alleged to have assisted in this crime actually committed the crime. And I don't believe there is sufficient evidence to show there was an agreement to commit this crime.

> Commonwealth: Your Honor, as to the proving who actually committed the crime, the defendant has told the Court through Detective Weaver, her boyfriend, Earl Pinkney, said that he, and Josh Stepoli, and Antoine Hairston went there to rob Chris Fincik.

> Court: Even not considering that; there is circumstantial evidence that Stepoli and Hairston purchased the ammunition, and had told her that they were going to commit a robbery, within two hours or three hours of the time of the killing. So, that is circumstantial evidence, even disregarding her statement.

15

Commonwealth: And so obviously, there is an agreement in this case, because she agreed to aid them in the robbery, because she bought the bullets for them, she knew they were going to commit a robbery before they went to Wal-Mart, and she bought the bullets, that obviously facilitated the robbery, and was an aid to them in committing the robbery.

Court: There was sufficient evidence in the record, if believed by the jury, that she entered into an agreement to at least aid. That is the jury's determination. That is why we are here. But there is testimony by the statement to Det. Weaver that she said, and we have a videotape showing her actually buying the ammunition, handing the money to the clerk and receiving the bullets, and carrying them out in a bag. And she said that she knew prior to that, in her statement to Weaver, if believed by the jury, that she knew they were going to commit a rob[bery].

Now there is no time frame expressed. Det. Weaver didn't say she said when it was going to happen, but at least by her statement that the ammunition was being purchased for the purpose of being used in a robbery, so your motions are denied.

N.T. 711-714.

This Court, having reviewed the entire record in this case, finds no error in Judge Bell's determination that there was sufficient evidence for the jury to deliberate. Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence to support Defendants' conviction for robbery. As noted above, the amount of aid provided to the principal need not be substantial. This Court finds that Defendant intended to promote or facilitate the robbery, and that Defendant provided substantial aid to the commission of the robbery by purchasing the bullets that Defendant knew would be used in the robbery. By Defendant's own statement to Det. Weaver, at a minimum, Defendant knew prior to the robbery that Stepoli and Hairston intended to commit a robbery. Defendant knew that Stepoli, Hairston, and her boyfriend, Pinkney had committed robberies together in the past, and that they used guns during those robberies. Yet, Defendant willingly purchased the ammunition at Wal-Mart knowing that said ammunition would be used to "hit a lick" (commit a robbery).

Defendant also argues that there was insufficient evidence for the jury to conclude that Defendant was an accomplice to robbery because the jury would have had to conclude beyond a reasonable doubt that Stepoli and/or Hairston engaged in the robbery. Defendant raised this issue at trial and was granted an instruction by the Court which required the jury to conclude beyond a reasonable doubt that all of the elements of the offensive robbery had been met against Stepoli

16

and/or Hairston prior to concluding that Defendant would be guilty of robbery. N.T. 795-800. Evidence was presented at trial that there was drug paraphernalia, a large amount of money, and numerous types of drugs at Victim's residence. Defendant argues that there was no money, drugs, or anything else taken from Victim's home the night Victim was shot. (Def.'s Br. 9). However, robbery does not require that the crime be completed; one can be guilty of robbery by attempting to commit robbery.

Further, Defendant's admissions presented at trial through Det. Weaver and Calabrese provide circumstantial evidence that Stepoli and/or Hairston engaged in an attempted robbery. Evidence was presented at trial that three men attempted to gain entry into Victim's house and that, after Victim resisted said entry, at least one of the suspects fired a gun through a door which resulted in Victim being shot and killed. Additional evidence was presented at trial by eyewitness Morris to the approximate height of the three suspects and further circumstantial evidence was presented at trial by Det. Dupilka regarding Stepoli, Hairston, and Pinkney's height. As indicated above, it is the sole province of the fact finder to determine the credibility and to believe all, part or none of the evidence presented. In the case sub judice, based on the evidence presented, a jury could reasonably infer that there was sufficient evidence presented to support the convictions of Robbery and Conspiracy to Commit Robbery. Viewing all of the evidence in a light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences therefrom, the evidence was sufficient to support the jury's verdict of guilty of the charges.

**Issue: Whether the weight of the evidence proved the defendant guilty beyond a reasonable doubt?**

Defendant alleges that the verdict was against the weight of the evidence. A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Commonwealth v. Cousar, 928 A.2d 1025, 1035-1036 (Pa. 2007). An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. Id. at 1036. The fact finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Id. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. Id. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where



the facts and inferences of record disclose a palpable abuse of discretion. Id. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. Id. See Commonwealth v. Keaton, 729 A.2d 529, 540–41 (Pa. 1999).

Defendant argues that the jury gave greater weight to the evidence of the killing of Victim by the robbers than the actual facts of Defendant's involvement. However, the jury acquitted Defendant of the killing and only convicted Defendant of the crimes with regard to robbery. The jury was certainly capable of determining whether to believe all, part, or none of the evidence with respect to whether the Commonwealth met its burden in charging Defendant with Robbery and Conspiracy to Commit Robbery. Based upon this Court's review of the entire record, this Court does not find that the jury's verdict is so contrary to the evidence as to shock this Courts' sense of justice. Therefore, this Court does not find that the jury's verdict was against the weight of the evidence.

**Issue: Whether the court erred in precluding defendant from presenting evidence that the defendant's co-conspirators were not charged?**

Defendant next alleges that the Court erred in precluding defendant from presenting evidence that Defendant's co-conspirators were not charged and argues that said evidence should have been permitted because it was relevant to the case. Defendant argued at trial and argues within its brief that Defendant should be allowed to bring out evidence to establish that the alleged co-conspirators were never charged with any crimes related to the death of Victim by the Commonwealth. Defendant argues that said evidence is relevant.

Pennsylvania Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Commonwealth v. Cook, 952 A.2d 594, 612 (Pa. 2008) citing Pa.R.E. 401. Building upon this definition, Rule 402 provides, in full, as follows: "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Id. citing Pa.R.E. 402. Thus, while the general rule of the admissibility of relevant evidence is subject to various exceptions, the rule that irrelevant evidence is not admissible is categorical. Id. Accordingly, "[t]he threshold inquiry with admission of evidence is whether the evidence is relevant." Id. citing Commonwealth v. Collins, 888 A.2d

(18)

564, 577 (Pa. 2005); Commonwealth v. Treiber, 874 A.2d 26, 32 (Pa. 2005); Commonwealth v. Robinson, 721 A.2d 344, 350 (Pa. 1998).

In Commonwealth v. Fremd, the Superior Court reaffirmed that a defendant can be convicted of conspiracy even when he or she is the only one so charged. 860 A.2d 515, 521 (Pa. Super. 2004). When examining the statute regarding conspiracy, the Court noted:

> The express language of the statute does not require that an alleged co-conspirator be charged or convicted of the conspiracy. Moreover, our Courts have held that the acquittal of a defendant's sole alleged co-conspirator does not preclude prosecution and conviction of that defendant on a conspiracy charge.

Id. See Commonwealth v. Campbell, 651 A.2d 1096 (Pa. 1994) (holding that acquittal of sole alleged co-conspirator does not per se preclude conviction of remaining defendant, even if defendants are jointly tried). Therefore, the Court determined that the path of prosecution, or non-prosecution, of a defendant's alleged co-conspirator(s) is irrelevant as to the prosecution of the defendant. Id. Rather, all that is required is proof of the elements of conspiracy, one of which is that the defendant conspired with one or more persons to commit or plan a crime. Id. Based on the aforementioned authority, this Court finds that it was irrelevant whether the alleged co-conspirators were charged in this case and that the trial court did not commit error in precluding Defendant from presenting such evidence.

**Issue: Whether the court erred in determining that the defendant's statement was admissible?**

Defendant alleges that the Court erred in permitting Det. Weaver to testify regarding statements that Defendant told Det. Weaver that Pinkney made to Defendant. Defendant raised the issue multiple times during the trial and extensive argument was heard regarding the same. The contested statements were the following:

> A: ...And also we talked about, she told me that people were saying that [Pinkney] was involved in the shooting. And she said she asked, confronted him. The first time he denied it, but he was acting real weird. So, she kept pushing it. And [Pinkney] then admitted that him, [Stepoli], and [Hairston] went to [Victim's] house

to rob him, because they knew he had a lot of money. And that during the course of the robbery, [Victim] was shot and killed.

She said that [Pinkney] apologized, because he said that if he would have known that [Victim] was her godfather, he wouldn't have went.

Q: Did [Pinkney] indicate anything about whether or not they were able to complete the robbery?

A: No, [Pinkney] told her that they didn't get anything. He said when they were there, [Pinkney] saw a girl go to the door. [Victim] opened the door to let the girl in, and that is when it happened.

N.T. 631. The Defense argued that said statements were "double hearsay" and not within the co-conspirator's exception to the hearsay rule. The Commonwealth argued that Defendants' statement to Det. Weaver was a statement of a party opponent pursuant to Pa.R.E. 803(25)(A) and, as such, was admissible in its entirety (including Pinkney's statements to Defendant).

"Hearsay" is a statement that the declarant does not make while testifying at the current trial or hearing and that a party offers in evidence to prove the truth of the matter asserted in the statement. Pa.R.E. 801(c). Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802. A statement offered against an opposing party that was made by the party in an individual or representative capacity is commonly referred to as an admission by a party opponent. 803(25)(A).

Although the Commonwealth argues that Pinkney's statements through Defendant are an admission by party opponent, this Court does not make such a finding. Rather, Pinkney's statements offered by Defendant through Det. Weaver are hearsay within hearsay. However, this Court agrees with the ruling of the trial court that the statements are excepted by the rule against hearsay under the co-conspirator exception. A statement offered against an opposing party that was made by the party's co-conspirator during and in furtherance of the conspiracy is not excluded by the rule against hearsay, regardless of whether the declarant is available. Pa.R.E. 803(25)(E).

Prior to the Court admitting the above-referenced statements under the co-conspirator's exception to hearsay rule, the Court heard testimony regarding the existence of a conspiracy from Defendant's cellmate Amy Calabrese (hereinafter "Calabrese"). Calabrese testified:

Q: Did you have one conversation with her before your preliminary hearing, or more than one conversation?

A: More than one.



Q: And did she ever talk to you about the nature of the charges that were against her?

A: Yes.

Q: And what in essence did she tell you about the charges and her involvement in the case?

A: She had told me that it was a, that she had killed somebody. It was a homicide charge.

Q: Did she identify the victim in the case?

A: She said her godfather, she kept saying Snacks.

Q: Did she indicate what led up to that, or what her involvement was?

A: She was at the Wal-Mart on videotape buying the bullets, and those, and that is how they had gotten her for all the charges.

Q: And did she say, identify who was involved?

A: Yes, she said Josh. I remember the name Josh. And then Antoine was the other name, so...

Q: And did she say what they did?

A: She said that they got in the car and all rode together. And she wasn't sure. She said she told the police that she didn't know they were going to do this, but she really did know. Yeah, she said she used her I.D., went into Wal-Mart and bought bullets, and got back in the car.

Q: And did she indicate...[w]hy the bullets were purchased at that time?

A: Yeah, they were going to rob somebody.

Q: Did she say who was going to rob somebody?

A: Her and two other people.
...

Q: And did she indicate why this robbery was intended to take place, why they were robbing Snacks?

A: They wanted the money and the drugs.



...

Q: Did Miss Hughes indicate anything about what her intentions were in the future...what she wanted to do with her life?

A: She said she thought it was cool to be a drug dealer. That is what she wanted to do to make money.

Q: Now did she indicate what she told the police about her involvement in this case?

A: Yeah, she told the police that she only, that she didn't know what was going on, that she just, she didn't go to the house, and she didn't tell them about the gun that they ended up destroying.

Q: What did she tell you about that?

A: She said that they went to some woman's house and destroyed the gun.

Q: What gun was she referring to, do you know?

A: Whatever gun they used in the robbery, that is what she said.
...

Q: Now you indicated that she told you, she related some details that she did following Snacks being shot. What did she say, Amy?

A: She said that she had taken them, they left, and they went and destroyed the gun.

Q: Did she say where they went to destroy the gun?

A: Some woman's house. She said the police will never find it.

Q: And did she indicate whether or not she actually saw the gun being destroyed?

A: She did day she did see it destroyed. N.T. 564-570.

After hearing the above testimony, the Court made the following ruling regarding whether to admit Pinkney's statements under the co-conspirator's exception:

Court: After listening to her testimony, I refer you again to the Commonwealth case, Commonwealth vs. Cull. And Cull indicates that if the conspiracy is ongoing, then the statement would come in as an exception under the co-conspirator rule. Even though it is close, I think that this witness has established that the conspiracy was ongoing, and this business of covering up the conspiracy was occurring. Because according to her testimony, whether it is believable or not by the jury, her testimony was --and the jury could believe this—that they went and destroyed the weapon in

22

order to help cover up the crime. And that fits in with the notion of the ongoing conspiracy rule.

Defense Counsel: And I understand the Court's ruling. I want to indicate for the record, as I indicated prior, this alleged statement by Earl Pinkney to her, according to Det. Weaver's interview, took place the next evening, approximately at least 18 hours later, even if you would believe that they destroyed this weapon. So, I would assert for the record that I don't believe the conspiracy was still ongoing at that point.

Court: Okay, I understand that. But I believe there is at least circumstantial evidence that in this case part of the crime was to continue covering up. N.T. 607-608

This Court agrees with the Trial Court that there was ample evidence that a conspiracy existed and that Pinkney's statement regarding concealing the crime was in furtherance of the conspiracy. Therefore, this Court finds that it was not error for the trial court to admit Pinkney's statement.

Even if Pinkney's statement were improperly admitted, any error was harmless. In harmless error analysis, the Commonwealth has the burden of proving beyond a reasonable doubt that the error could not have contributed to the verdict. Commonwealth v. Moore, 937 A.2d 1062, 1073 (Pa. 2007); Commonwealth v. Mitchell, 839 A.2d 202, 214 (Pa. 2003). An error may be deemed harmless, inter alia, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. Id. (internal citations omitted).

After review of the entire record, the Commonwealth's argument regarding this issue is persuasive. Evidence of a robbery was clear in that Manges and Calderone, who were inside Victim's home at the time of the killing, testified that individual(s) were attempting to force open the back door as Victim attempted to close the door before shots were fired and Victim was killed. N.T. 151-155. A substantial amount of drugs and money were on the kitchen table at the time of the killing. N.T. 361-366. Stepoli told Defendant that Stepoli intended to "hit a lick" (to commit a robbery). N.T. 628-630. Defendant used her identification to purchase ammunition at Wal-Mart at 9:12 p.m. on December 2, 2012. N.T. 221-223; 626-628. The killing of Victim took place at approximately 12:25 a.m. on December 3, 2012. N.T. 348. Calabrese testified that Defendant admitted to her that Defendant was engaged in a robbery for drugs and money from Victim. N.T. 564-567.

(23)

Pinkney's statement implicated himself in the crime and potentially assisted Defendant in that Pinkney's statement contradicted Calabrese's testimony regarding Defendant's statements to Calabrese. Additionally, Pinkney's statements did not implicate Defendant in the crime. For the aforementioned reasons, this Court finds that if it was error to admit Pinkney's statements under the co-conspirator exception to the rule against hearsay, any error was harmless because any prejudicial effect of the alleged error was so insignificant that it could not have contributed to the jury's verdict.

**Issue: Whether the court erred in directing that the defendant make payment for the cost of the autopsy?**

During the Sentencing hearing on July 7, 2014, Westmoreland County Adult Probation Office Wynn Hamm testified that his Pre-Sentence Investigation noted that the Westmoreland County Coroner requested $4,923.00 restitution for the costs of the autopsy performed on the victim. N.T. July 7, 2014, p. 20-21. Before pronouncing the Sentence, the Court provided both counsel and the Commonwealth an opportunity to address the Court. N.T. July 7, 2014, p. 24. Defense counsel stated:

> The only other thing I would mention, Your Honor, and perhaps I could find a case for you. Because she was acquitted of the murder, I do not believe that the autopsy is restitution – I mean, that's a minor point. But I'm not sure that that should be ordered in this particular case, because she was not convicted of anything related to the death of [the victim].

N.T. July 7, 2014, p. 32. In response, the following dialogue occurred:

> Court: Do you know anything about the restitution? There's argument concerning the restitution. She was not convicted of the homicide, and the autopsy dealt with, obviously, the death of [the victim].
>
> Commonwealth: Well, obviously there's some sense to his argument, but as a result of the robbery, [the victim] died.
>
> Court: The jury attached no criminal liability to [Defendant] for that by their verdicts.
>
> Defense Counsel: I don't know of a specific case, Your Honor. I do remember there is a case, and that it was involving a victim asking for restitution for funeral expenses and things like that when they were acquitted. I mean, it's a matter of when I can give it to the Court within the next ten days or something.



Court: Here, the sentence I pronounce, when I pronounce it should be complete. So why don't you two come up here?

(SIDEBAR CONFERENCE HELD OFF THE RECORD)

Court: Here at sidebar I think we resolved the question as to restitution of $4,923.00. For the record, I do not intend to impose that because those costs deal with the homicide. She was absolved of criminal liability by the jury relative to that. Anything else either of you want to say before I pronounce sentence?

N.T. July 7, 2014, p. 32-34. After pronouncing the factors the Court considered for sentencing, the Court sentenced Defendant to the following:

At Count 1 of the information, it is the sentence of the Court that the defendant is to be sentenced to a period of incarceration of not less than 54 months, nor more than 108 months at a state penal institution to be determined by the Department of Corrections. She is not RRRI eligible. She is to be given credit for time served from December 27[], 2012 to the present. She is to pay the costs of prosecution and she is given 5 years to do that. There is restitution to be paid to the Pennsylvania State Police Crime Lab User Fee in the amount of $109.00, and she is to be provided with rehabilitative services by the Department of Corrections while she undergoes her sentence at a state penal institution. [] I'll make it she's to pay within 3 years after release from incarceration.

At Count 5 of the information, the defendant is –so that you understand this, I can run a consecutive sentence on this, Ms. Hughes. [] A sentence of not less than 54 months, nor more than 108 months at a state penal institution to be determined by the Department of Corrections. She is not RRRI eligible. She's to pay the costs of prosecution within 3 years of her release from incarceration, and I'll run that sentence concurrent with Count 4. So your total period of incarceration is 54 months to 108 months, which is a 4 and a half – in layman's terms, 4 and a half years to 9 years.

N.T. July 7, 2014, p.49-51. Thereafter, the following exchange occurred:

Court: Is there anything else, Mr. Peck, I need to put into the sentence?

Commonwealth: Just one thought, Your Honor, not to belabor this. The robbery did cause serious bodily injury. It did cause death. And I think based on that she should be responsible for the Coroner's costs. I know that you've already made that decision.

Court: I'm willing to listen to –the sentencing is still open. I'm willing to listen to argument on that.

Commonwealth: That's what I would suggest, Your Honor. It certainly is related to the robbery. She was found not guilty of homicide, but she was found guilty of robbery. The robbery, an element where there's a serious bodily injury or death as part of the crime, so I think she is responsible for the autopsy.



Defense Counsel: Your Honor, once again, as we both indicated, it's not a huge matter in sentencing, but at the time of the trial, if the Court recalls, there was a question from the jury indicating do we need to conclude beyond a reasonable doubt that they intended to commit that robbery or any robbery, and I believe that the jury's – our response to that was any robbery. I believe the accomplice liability was not to this specific robbery so –

Court: But they had to find this robbery. That was the only robbery in front of them.

Defense Counsel: I still believe the restitution is not appropriate, but whatever the Court determines.

N. T. July 7, 2014, p. 52-53. Without providing a reason for the Court changing its position regarding the issue, the Court stated:

Court: Well, in an abundance of caution, I'm going to order it. I'm going to order restitution in the amount of $4,923.00 to the Coroner's Office of Westmoreland County. And again, that should be paid within 3 years of her release from incarceration. And that's at both counts, Laurel. And that should be jointly and severally made with any co-defendants that are prosecuted in this matter.

N.T. July 7, 2014, p. 53.

Defendant argues, and in its response the Commonwealth agrees, that money directed as restitution in this case for performance of an autopsy and other matters by Dr. Cyril Wecht (and his staff) would more properly fall under a cost of prosecution. Def.'s Br. 22.; CW.'s Br. 18. Fundamentally, Defendant argues that the autopsy was performed as a result of the Homicide and that, because Defendant was not convicted of the homicide, murder, or any other related offenses, the costs associated with the autopsy should not be borne by Defendant. (Def.'s Br. 22). As a result, Defendant asks this Court to strike the Order of restitution and/or court costs as it relates to the costs associated with the autopsy and other matters associated with investigating the death of Victim. (Def.'s Br. 23).

The Commonwealth argues that Defendant was convicted of Robbery and Conspiracy to commit robbery, that robbery is committed when "if, in the course of committing a theft, he inflicts serious bodily injury upon another[11], and as such, it was necessary for the prosecution to establish that the victim suffered seriously bodily injury and died as a result of the wounds inflicted by his

---

[11] 18 Pa.C.S.A. § 3701(a)(1)(i) Robbery. (a) Offense defined. (1) A person is guilty of robbery if, in the course of committing a theft, he: (i) inflicts serious bodily injury upon another.

assailants during the robbery. (CW.'s Br. 19). The Commonwealth argues that the autopsy was a necessary and allowable expense in the investigation and prosecution of Defendant. (CW.'s Br. 19).

While the Commonwealth cites numerous cases which speak to its authority to impose costs of prosecution upon a defendant, all of the cited cases involve situations which are distinguishable from the case *sub judice*[12] in which the defendant was convicted of the charges that necessitated the Commonwealth's expenses. The Commonwealth offers no statutory or case law that would enable the Commonwealth to impose costs upon a defendant for charges of which the defendant was exonerated. Although the Commonwealth argues to the contrary, the autopsy was not necessary to establish that the victim suffered serious bodily injury.

For the reasons set forth above, the Court enters the Order of Court attached hereto.

BY THE COURT:

_____
Meagan Bilik-DeFazio, Judge

---

[12] Commonwealth v. Coder, 415 A.2d 406, 408-410 (Pa. 1980) upheld the imposition of approximately $8,000.00 in costs and changing venue upon defendant, however, change of venue was at defendant's request.
Commonwealth v. Larsen, 682 A.2d 783, 796-797 (Pa. Super. 1996) upheld nearly $40,000.00 in costs associated with convening a grand jury investigation, however, said investigation culminated in a trial and conviction of defendant.
Commonwealth v. Cutillo, 440 A.2d 607, 609 (Pa. Super. 1982) upheld the imposition of costs to pay for a local constable service to guard defendant at the hospital until he recovered and could be arrested and incarcerated because costs expended were necessary to prevent escape and ensure protection, and defendant was convicted of the crimes for which he was being guarded in the hospital.
Commonwealth v. Hower, 406 A.2d 754, 758 (Pa. Super. 1979) upheld the imposition of prosecution expenditures to retain a surveyor and physicist to testify as automobile accident reconstruction experts in prosecution of defendant who was charged with and convicted of driving while intoxicated and involuntary manslaughter.
In a footnote, the Commonwealth cites and attaches a transcript of the hearing on the Petition to Tax costs in the case Commonwealth v. Jennifer Long (No. 624 C 1996). In said case, the Court upheld the autopsy costs as proper costs of prosecution assessable to the defendant, however in said case, defendant plead guilty to involuntary manslaughter.

27

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  )
                                          )
              vs.                )    NO.    429 C 2013
                                            )
CHALSEE L. HUGHES              )

## ORDER OF COURT

AND NOW, to wit, this 23rd day of December, 2014, for the reasons set forth in the foregoing Opinion, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1.    Defendant's Post Trial Motion regarding sufficiency of the evidence is DENIED.

2.    Defendant's Post Trial Motion regarding weight of the evidence is DENIED.

3.    Defendant's Post Trial Motion regarding defendant being precluded from presenting evidence that the defendant's co-conspirators were not charged is DENIED.

4.    Defendant's Post Trial Motion regarding admissibility of defendant's statement is DENIED.

5.    Defendant's Post Trial Motion regarding payment of the autopsy cost is GRANTED. The Order of Sentence dated July 7, 2014, is hereby amended to vacate the requirement for payment of restitution to the Westmoreland County Coroner's Office.

BY THE COURT:

_____
Meagan Bilik-DeFazio, Judge

COPIES

cc:    John W Peck, Esq., District Attorney
       Timothy C. Andrews, Esq., for Defendant
       Chalsee L. Hughes, Defendant
       District Court Administrator